**Slip Op. 99-27**

# UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                  :
FERRO UNION, INC. AND             :
     ASOMA CORPORATION,           :
                                  :
          Plaintiffs,             :
                                  :
          v.                      :    Court No. 97-11-01973
                                  :
UNITED STATES,                    :    Public Version
                                  :
          Defendant,              :
                                  :
     and                          :
                                  :
WHEATLAND TUBE COMPANY,           :
                                  :
          Defendant-Intervenor.   :
_____ :
```

[Antidumping determination remanded.]

Dated: March 23, 1999

Mayer, Brown & Platt (Simeon M. Kriesberg, Carol J. Bilzi, Peter C. Choharis, Monica B. Goldberg, Andrew A. Nicely) for plaintiffs.

David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (A. David Lafer, Michele D. Lynch), Karen Bland, International Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Schagrin Associates (Roger B. Schagrin, R. Alan Luberda, John C. Steinberger) for defendant-intervenor.

## OPINION

**RESTANI, Judge:**  This matter is before the court on a motion for judgment upon the agency record pursuant to USCIT Rule 56.2. Ferro Union, Inc. and Asoma Corporation (collectively "Ferro

Union" or "Plaintiffs") challenge the determination of the United States International Trade Administration ("Commerce" or the "Department") in <u>Certain Welded Carbon Steel Pipes and Tubes from Thailand</u>, 62 Fed. Reg. 53,808 (Dep't Commerce 1997) (final results of antidumping admin. rev.) [hereinafter "<u>Final Results</u>"].

Ferro Union raises two grounds for reversal or remand of the Final Results.  The facts relating to each count will be stated separately.

### Jurisdiction and Standard of Review

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c)(1994).  In reviewing final determinations in antidumping duty investigations, the court will hold unlawful those agency determinations which are unsupported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B) (1994).

## I.  Termination of the Antidumping Review

### Background

Commerce issued an antidumping duty order on welded carbon steel pipes and tubes from Thailand in 1986.  <u>Circular Welded Carbon Steel Pipes and Tubes from Thailand</u>, 51 Fed. Reg. 8,341 (Dep't Commerce 1986).  On March 4, 1996, Commerce published a notice of opportunity to request an administrative review of the

1986 order for the period March 1, 1995 to February 29, 1996. Notice of Opportunity to Request Administrative Review, 61 Fed. Reg. 8,238 (Dep't Commerce 1996). In this notice, Commerce stated that requests for review were to be made "[n]ot later than March 31, 1996." Id.

Saha Thai Steel Pipe Co., Ltd. ("Saha Thai"), and S.A.F. Pipe Export Co., Ltd. ("SAF"), Saha Thai's affiliated exporter, along with Ferro Union and Asoma Corp., Saha Thai's U.S. importers, filed a request for review on April 1, 1996.[1] Request for Review (Apr. 1, 1996), Pl.'s App., 15A-15B. Thai Union Steel Co., Ltd. ("Thai Union"), another Thai producer, also timely requested a review. Final Results, 62 Fed. Reg. at 53,809. Thai Union is not a party to this action. Commerce announced its initiation of the review on April 25, 1996. Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 61 Fed. Reg. 18,378, 18,378-79 (Dep't Commerce 1996). On May 9, Commerce issued the preliminary results for a preceding administrative review of the same merchandise, and assigned Saha Thai an antidumping margin of 1.07 percent. Certain Welded Carbon Steel Pipes and Tubes from Thailand, 61 Fed. Reg. 21,159, 21,161 (Dep't Commerce 1996)

---

[1]    This request was timely pursuant to 19 C.F.R. § 353.31(d)(1995), which provides that when a deadline falls on a non-business day, Commerce will accept documents filed on the next business day.

(prelim. results of admin. rev.).[2]  Plaintiffs claim that this low margin prompted Saha Thai's May 14, 1996 request that Commerce terminate the review with respect to sales by Saha Thai. Request for Termination (May 14, 1996), Pl.'s App., 16A-16B.

The domestic interested parties, Allied Tube and Conduit Corporation, Laclede Steel Company, Sawhill Tubular Division of Armco, Inc., and Wheatland Tube Company,[3] (collectively the "Domestic Interested Parties"), objected to a termination of the administrative review on the basis that they had made a timely request for review on March 29, 1996.  Schagrin Associates' Comments on Request to Terminate Review (June 21, 1996), P.R. 8, DIP's App., p. 23.  In late May, counsel for the Domestic Interested Parties spoke with Commerce supervisor, Jean Kemp, and learned that Commerce had no record of a request for review by the Domestic Interested Parties in its Central Records Unit, Room B-099.[4]  Id. at 2.  Nevertheless, the Domestic Interested Parties were able to produce evidence of their March 29 request.[5]

_____

[2]     This administrative review covered the period March 1, 1994 to February 28, 1995.  61 Fed. Reg. at 21,159.

[3]     Wheatland Tube Company ("Wheatland") is a Defendant-Intervenor in this action.

[4]     Commerce considers documents "received" when they are "stamped by the Central Records Unit with the date and time of receipt."  19 C.F.R. § 353.31(d)(1995).  No such date-stamped copy of the Domestic Interested Parties' request has been found.

[5]     The Domestic Interested Parties submitted an affidavit

(continued...)

Commerce found that "the evidence on the record does not provide a definitive answer" regarding whether there was any "official record of petitioners' request." Commerce Memorandum to Robert S. LaRussa from Stephen J. Powell (July 11, 1996), P.R. 14, DIP's App., p. 44. Commerce concluded that "because the reason for the filing error is unclear and given the remedial nature of the antidumping law and the fact that Saha Thai received notice of the [Domestic Interested Parties'] request," it could elect to continue the ongoing administrative review. Final Results, 62 Fed. Reg. at 53,809.

Ferro Union claims that Commerce violated its regulations by denying Saha Thai's request for termination and continuing the review.

---

[5](...continued)
from Jeffrey Combs, a messenger from Quick Messenger Service of Washington, D.C., stating that he remembered delivering a package from Schagrin Associates to the Central Records Unit at the Department of Commerce on March 29, 1996. Mr. Combs' log for the day was also attached, showing that a package was delivered to Room B-099 to a person named "Josey." Schagrin Associates' Comments on Request to Terminate Review (June 21, 1996), P.R. 8, DIP's App., 23 at ex. 2. Counsel for the Domestic Interested Parties also submitted an affidavit stating that he had addressed an original and seven copies of the request to the Central Records Unit, along with a copy to Ms. Pamela Woods in Room 3065. Id. at ex. 3. Ms. Woods indicated that she had received the courtesy copy of the request. Id. at 4. The Domestic Interested Parties also served their request on counsel for Ferro Union and Saha Thai.

**Discussion**

Ferro Union asserts that Commerce was obliged to terminate the review on the grounds of Commerce's own regulations and the agency's established practice under those regulations. Ferro Union also argues that the evidence of the Domestic Interested Parties' request was not a sufficient independent ground for Commerce to conduct the review.

Under the antidumping statute, 19 U.S.C. § 1675(a)(1)(1994), Commerce must conduct an administrative review of an anti-dumping duty order if a party requests such a review.[6] This method of commencing reviews replaced the former requirement that Commerce conduct reviews on an annual basis, regardless of requests for review by foreign producers, importers, or domestic interested parties. See Trade Agreements Act of 1979, Pub. L. No. 96-39, Title I, § 101, 93 Stat. 175 (1979) (amending Tariff Act of 1930) (Sec. 751 administrative review of determinations). When Congress eliminated the obligatory annual reviews, the conference agreement stated that this change was "designed to limit the

---

[6]    Section 1675(a)(1) of Title 19 provides: "At least once during each 12-month period beginning on the anniversary of the date of publication of ... an antidumping duty order under this subtitle ... the administering authority, if a request for such a review has been received and after publication of notice of such review in the Federal Register, shall -- (B) review, and determine ... the amount of any antidumping duty ... and shall publish in the Federal Register the results of such review, together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed."

number of reviews in cases in which there is little or no interest, thus limiting the burden on petitioners and respondents, as well as the administering authority."  H.R. Rep. No. 98-1156, 98th Cong., 2d Sess. at 181 (1984), reprinted in 1984 U.S.C.C.A.N. 5220, 5298.  The statute does not make any provisions for the termination of administrative reviews.

Commerce did not establish a method of withdrawing a request for review until it issued its final rules in March 1989, which implemented the 1984 amendments.

> The Secretary may permit a party that requests a review ... to withdraw the request not later than 90 days after the date of publication of notice of initiation of the requested review.  The Secretary may extend this time limit if the Secretary decides that it is reasonable to do so.  When a request for review is withdrawn, the Secretary will publish in the Federal Register notice of [the termination of the review.]

Antidumping Duties: Final Rule, 54 Fed. Reg. 12,742, 12,778 (Dep't Commerce 1989) [hereinafter "1989 Regulations"] (codified at 19 C.F.R. § 353.22(a)(5)(1995)).[7]

The commentary to 19 C.F.R. § 353.22(a)(5) addresses situations where one party has submitted a request for review, but it does not indicate how Commerce would respond to situations

---

[7]     Prior to the promulgation of 19 C.F.R. § 353.22, this court found that Commerce had "reasonably interpreted the statute [19 U.S.C. § 1675(a)(1)] as allowing it discretion to deal with this issue [of withdrawing requests for administrative reviews]." Sugiyama Chain Co., Ltd. v. United States, 18 CIT 423, 430, 852 F. Supp. 1103, 1110 (1994).

where multiple parties make a request for review and then
disagree over whether to terminate the review.  See 1989
Regulations, 54 Fed. Reg. at 12,755.  In its final regulations
issued to comply with the Uruguay Round Agreements Act ("URAA"),
Pub. L. No. 103-465, 108 Stat. 4809 (1994), Commerce amended 19
C.F.R. § 353.22(a)(5).  The new provision provides:

> Withdrawal of request for review.  The Secretary will
> rescind an administrative review under this section, in
> whole or in part, if a party that requested a review
> withdraws the request within 90 days of the date of
> publication of notice of initiation of the requested review.
> The Secretary may extend this time limit if the Secretary
> decides that it is reasonable to do so.

Antidumping and Countervailing Duties: Final Rule, 62 Fed. Reg.
27,296, 27,393 (Dep't Commerce 1997) (codified at 19 C.F.R. §
351.213(d)(1) (1998)) (hereinafter 1998 Regulations).[8]

Ferro Union claims that the 1989 Regulations, 19 C.F.R. §
353.22(a)(5), mandated termination of antidumping reviews if the
termination request was made within 90 days.  Ferro Union bases
this argument on that fact that the last sentence of the

---

[8]      These final regulations were issued after the
commencement of the review of Saha Thai, therefore the earlier
rule as found at 19 C.F.R. § 353.22(a)(5) (1995) is the relevant
regulation.  Commerce stated, however, that the 1998 Regulations
contained in part 351 "serve as a restatement of the Department's
interpretation of the requirements of the [Tariff] Act as amended
by the URAA" for administrative reviews "initiated on the basis
of ... requests made after January 1, 1995, but before part 351
applies."  1998 Regulations, 62 Fed. Reg. at 27,417.  The court
will therefore consider Commerce's discretion to deny a request
for termination under both 19 C.F.R. § 353.22(a)(5)(1995) and 19
C.F.R. § 351.213(d)(1)(1998).

regulation says that the Secretary "will" publish notice of termination if the request is "withdrawn," and that it is the party, and not Commerce, which withdraws the request.

The plain language of 19 C.F.R. § 353.22(a)(5) states that the Secretary "may" permit a party who requested a review to withdraw that review. Therefore, on its face, 19 C.F.R. § 353.22(a)(5) did not mandate that Commerce terminate these reviews. Although the 1998 final regulations, 19 C.F.R. § 351.213(d)(1) (1998), state that the Secretary "will rescind" an administrative review that is withdrawn, whether the withdrawal will be recognized is discretionary. Furthermore, the legislative history of 19 U.S.C. § 1675(a) indicates that Congress intended to limit reviews in which no one had an interest, and Commerce could rightly continue a review in which there is an expressed interest.

While 19 C.F.R. § 351.213(d)(1) (1998) is written in more mandatory language, neither 19 C.F.R. § 353.22(a)(5)(1995) nor 19 C.F.R. § 353.213(d)(1) (1998) address the question of terminating reviews when more than one party makes an initial request for the administrative review. When faced with such a situation, Commerce could reasonably conclude that it has discretion as to whether or not to terminate the review.[9]

---

[9]      Ferro Union cites numerous cases stating that agencies

Plaintiffs also allege that Commerce has established an unswerving practice of granting requests for termination of administrative reviews, and that this consistent practice required that Commerce terminate its review of Saha Thai.[10] Plaintiffs have attached a list of over 180 cases where Commerce granted termination requests.[11] Plaintiffs are correct that Commerce has granted numerous requests for termination. Plaintiffs claim that these include instances where multiple

---

[9](...continued)
are required to abide by their own regulations.  See Voge v. United States, 844 F.2d 776, 779 (Fed. Cir. 1988) ("government officials must follow their own regulations"); Reuters Ltd. v. FCC, 781 F.2d 946, 950 (D.C. Cir. 1986) ("elementary that an agency must adhere to its own rules and regulations.") This rule, however, is only applicable if one assumes that Commerce's regulations did mandate a termination of the review upon request. As indicated, the regulations do not fully address the situation at hand.

[10]      Plaintiffs rely on M.M.&P. Maritime Advancement, Training, Education & Safety Program v. Department of Commerce, 729 F.2d 748 (Fed. Cir. 1984) for the rule that Commerce is obliged to follow its own precedent and "if it chooses to change, it must explain why."  M.M.&P., 729 F.2d at 755.  In that case, the Federal Circuit found that Commerce had not violated this principle of administrative law, because Commerce had not "consistently required that [an] article must be used in formal-science oriented education" in order to qualify for duty-free entry under the Educational, Scientific, and Cultural Materials Importation Act of 1996.  Id.  Likewise, the court does not find that Commerce has established a consistent practice of granting a request for termination of an administrative review when more than one party has expressed an interest in the review, and there is evidence of a timely request by the non-withdrawing party.

[11]      Attachments to Memorandum of Points and Authorities in Support of Plaintiff's Motion for Judgment on the Agency Record (May 1, 1998), Pl. Br., Att. 1.

parties requested the initiation of the administrative review. In situations involving multiple parties, however, Commerce has only granted termination when no other party objected to the termination.[12]  Indeed, one case cited by Plaintiffs shows that Commerce does not terminate reviews when another party objects. In Sweaters Wholly or in Chief Weight of Man-Made Fiber from Hong Kong, 58 Fed. Reg. 63,917 (Dep't Commerce 1993) (prelim. results of and termination in part of admin. rev.), Commerce terminated the review of two companies, but declined to terminate the review of a third, Everest Knitwear, because "petitioners had requested Everest be reviewed."  Id. at 63,917.

In Potassium Permanganate from the People's Republic of China, 59 Fed. Reg. 46,035 (Dep't Commerce 1994) (termination of admin. rev.), Commerce granted a termination request although a respondent objected to this termination.  In this case,

---

[12]    In Antifriction Bearings (Other Than Tapered Roller Bearings), 59 Fed. Reg. 9,463 (Dep't Commerce 1994) (prelim. results and partial termination of admin. rev.), the antidumping review results involved 38 manufacturers/exporters.  Commerce terminated the reviews of nine other manufacturers/exporters because the requests were withdrawn in a timely manner by six companies and "there were no other requests for review of these companies from any other interested parties."  Id. at 9,465. Likewise, in Certain Fresh Cut Flowers from Colombia, 56 Fed. Reg. 32,169 (Dep't Commerce 1991) (final results of admin. rev.), the review covered numerous producers of subject merchandise, but reviews of 18 producers and/or exporters were terminated "because these companies withdrew their requests for a review on a timely basis and the petitioner did not request reviews of them."  Id. at 32,170.

respondent Zunyi Chemical Factory did not make its own request for review.  Commerce concluded that "Zunyi could have ... guaranteed its right to continue this review, by making its own request for review at the proper time."  Id. at 46,035.[13]  This case reveals Commerce's preference that interested parties file individual requests for review, rather than rely on another party's request.  The Domestic Interested Parties tried to do just that.  Commerce could reasonably distinguish the Domestic Interested Parties from Zunyi, because they did try to "preserve their right to compel the review" by filing their own request.  Commerce's conclusion that it was not clear who was responsible for the filing error does not lead to a conclusion that the Domestic Interested Parties are in the same position as Zunyi.  Unlike the Domestic Interested Parties, Zunyi never attempted to file its own request for review.

Moreover, Commerce retains some flexibility to relax its procedural rules.  See American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 539 (1970) ("[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice

---

[13]     Commerce reached the same conclusion in Potassium Permanganate from the People's Republic of China, 59 Fed. Reg. 48,419 (Dep't Commerce 1994) (termination of admin. rev.), involving the same product and parties.

require it.") (quoting <u>NLRB v. Monsanto Chemical Co.</u>, 205 F.2d

763, 764 (8th Cir. 1953)).[14]  Plaintiffs argue that Commerce could

not have legitimately conducted the review based on the request

by the Domestic Interested Parties, on the grounds that 19 U.S.C.

§ 1675(a) is a jurisdictional provision, which only allows

Commerce to conduct administrative reviews if a request is

"received" according to the regulatory definition of

"received."[15]  The court disagrees.  The statute does provide

that Commerce will conduct the administrative review upon receipt

---

[14]     Moreover, Plaintiffs did not sustain "substantial
prejudice."  <u>See</u> <u>American Farm Lines</u>, 397 U.S. at 539 (agency's
modification of its procedural rules "not reviewable except upon
a showing of substantial prejudice to the complaining party.")
Plaintiffs' argument that Saha Thai was substantially prejudiced
by the continuation of the administrative review necessarily
fails.  A party is not prejudiced by a "technical defect simply
because that party will lose its case if the defect is
disregarded.  Prejudice, as used in this setting, means injury to
an interest that the statute, regulation or rule in question was
designed to protect."  <u>Intercargo Ins. Co. v. United States</u>, 83
F.3d 391, 396 (Fed. Cir. 1996).  Neither the statute nor
Commerce's regulations gave Saha Thai a right to be free of the
administrative review.  It received timely notice, which is all
it was due.

[15]     The regulation in force when the Domestic Interested
Parties submitted their request for review stated "For all time
limits ... the Secretary will consider documents received when
stamped by the Central Records Unit with the date and time of
receipt."  19 C.F.R. § 353.31(d) (1995).  The wording changed in
the 1998 regulations to read, "no document will be considered as
having been received by the Secretary unless it is submitted to
the Central Records Unit and is stamped by the Central Records
Unit with the date and time of receipt."  19 C.F.R. § 351.103(b)
(1998).  The court does not decide if the difference is
significant.

of a request for review.  See 19 U.S.C. § 1675(a).  The
regulatory definition of "receipt" in effect at the time did not
prevent Commerce from exercising its discretion to conclude that
a party has made a request, even in the absence of a date-stamped
copy of the request.  The regulation merely mandated that if a
valid date-stamped copy of the request is produced it will
determine the date of receipt.  Here, the evidence tends to show
that in all likelihood Commerce did misfile the request.  While
the Domestic Interested Parties should have retained a date-
stamped copy, such an error did not deprive Commerce of its
ability to act.

The court finds that Commerce had the right under the facts
of this case and the then applicable law to exercise discretion
in determining whether to grant Saha Thai's request for
termination, and that it did not abuse this discretion when it
denied the request for termination and continued the
administrative review of Saha Thai.

## II.  Calculation of the Antidumping Margin

### Background

In their second count, Plaintiffs challenge the manner in
which Commerce conducted the antidumping review of Saha Thai.
Plaintiffs' arguments center around the interpretation of new
provisions of the Tariff Act, as amended by the URAA.  In

particular, Plaintiffs challenge the meaning of "affiliated persons" under 19 U.S.C. § 1677(33) (1994) and the application of adverse facts available pursuant to 19 U.S.C. §§ 1677e(a) and 1677e(b) (1994).  The court will first review the facts of Commerce's investigation.

In its first questionnaire to Saha Thai, Commerce requested information to determine whether subject merchandise produced by Saha Thai, or exported to the United States, was sold at prices below the normal value.  Questionnaire (undated), at 1, P.R. Doc. 138, Def.'s App., Ex. 3, at 6.  Commerce requested that Saha Thai provide information on its corporate structure and affiliations. Saha Thai was to provide a list of its ten largest shareholders, as well as a list and description of companies affiliated with Saha Thai "through means other than stock ownership."  Id. at A-4, P.R. Doc. 138, Def.'s App., Ex. 3, at 15.  The questionnaire included a glossary of terms, which stated that "antidumping law subjects transactions between affiliated persons to special scrutiny."  The term was defined as it appears in Section 771(33) of the Tariff Act (19 U.S.C. § 1677(33)).  Id. at App. I, P.R. Doc. 138, Def.'s App., Ex. 3, at 21.  Commerce did not request a complete list of Saha Thai's directors and officers.

Saha Thai's response to this questionnaire listed its ten largest shareholders both before and after July 31, 1995.[16] Proprietary Questionnaire Responses (July 16, 1996), at Exs. 6-7, C.R. Doc. 2, Def.'s App., Ex. 4, at 15 and 17.  Saha Thai identified several companies that "might be considered affiliated parties" based on common management.  Id. at Exs. 6-7, C.R. Doc. 2, Def.'s App., Ex. 4, at 8-9.[17]  In this response, Saha Thai did not identify these companies as members of the Siam Steel Group International Co., Ltd., nor did it mention Saha Thai's membership in this group.  It also failed initially to identify Company D[18], a member of the Siam Steel Group and a home market customer.

Commerce sought information on the Siam Steel Group and its relationship to Saha Thai in its first supplemental questionnaire.  Supplemental Questionnaire (Aug. 26, 1996), at 1, C.R. Doc. 56, Def.'s App., Ex. 5, at 3.  Saha Thai responded to this questionnaire by listing the names and addresses of the companies in the Siam Steel Group, and by providing a list of common shareholders.  Saha Thai's Response to Supplemental

---

[16]    On July 31, 1995, during the middle of the period of review ("POR"), Saha Thai underwent a corporate reorganization. Proprietary Questionnaire Responses (July 16, 1996), at 6, C.R. Doc. 2, Def.'s App., Ex. 4, at 8.

[17]    [                ]

[18]    [                ]

Questionnaire (Sept. 23, 1996), at Ex. A, C.R. Doc. 8, Def.'s App., Ex. 6, at 10.  Saha Thai stated that these companies represented the investments of members of the Karuchit/ Kunanuantakul family.  Id. at 1, C.R. Doc. 8, Def.'s App., Ex. 6, at 3.[19]  The list of Siam Steel Group companies included Company D, but Saha Thai still did not state that it was a home market customer.

Commerce pursued the relationship with the Siam Steel Group in its second supplemental questionnaire.  Commerce asked whether any members of the group produced subject merchandise. Supplemental Questionnaire (Nov. 1, 1996), at 64, P.R. Doc. 37, Def.'s App., Ex. 7, at 2.  Saha Thai responded that no members of the group produced steel pipe and that none of the companies in the group controlled Saha Thai, "through stock ownership or otherwise."  Saha Thai's Response to Supplemental Questionnaire (Nov. 26, 1996), at 1-2, C.R. Doc. 14, Def.'s App., Ex. 8, at 2-3.  Company E[20], a member of the Siam Steel Group, produces PVC lined steel water-pipe.  Saha Thai did not state that Company E produced subject merchandise.  In its appendix to the September 23, 1996 response to Commerce's first supplemental questionnaire, the description of each Siam Steel Group company stated that

---

[19]     [                    ]

[20]     [                  ]

Company E manufactured electrical construction materials "such as conduit pipe ... including PVC lined steel water-pipe, etc." Saha Thai's Response to Supplemental Questionnaire (Sept. 23, 1996), at Ex. A-2, C.R. Doc. 8, Def.'s App., Ex. 6, at 11. Commerce ultimately determined that the evidence on the record did not establish that the pipe manufactured by Company E was within the scope of the antidumping duty order.  Final Results, 62 Fed. Reg. at 53,817.

Commerce conducted a cost verification of Saha Thai's responses from January 27 to February 1, 1997.  During verification, Commerce became aware of ownership interests held by Saha Thai executive officers in three home market customers. Decision Memo -- Application of Facts Available (Mar. 31, 1997), at 4, C.R. 33, Def.'s App., Ex. 14, at 4.  At this point, Commerce also gathered further information regarding the Siam Steel Group.  After verification, Commerce received public information regarding a potential affiliation between Saha Thai and another Thai pipe producer, Thai Hong Steel Pipe Co., Ltd. ("Thai Hong"), based on the management of Thai Hong by the Lamatipanont family.  Id. at 5, Def's App., Ex. 14, at 5.

Commerce sent Saha Thai two post-verification questionnaires.  In the first such questionnaire Commerce asked for a description of all affiliations between Saha Thai, Thai Hong, and the Lamatipanont family.  Supplemental Questionnaire

(Feb. 27, 1997), at 1, P.R. Doc. 83, Def.'s App., Ex. 9, at 1.
Saha Thai responded that Thai Hong had entered into bankruptcy in
1992, and attached a bankruptcy certificate from the Thai
Ministry of Commerce.  Saha Thai's Post-Verification Response to
Questionnaire (Mar. 12 1997), at 1-2, C.R. Doc. 30, Def.'s App.,
Ex. 10, at 1-2.  Saha Thai stated that Thai Hong was controlled
by Surasak Lamatipanont and Samarn Lamatipanont, the nephews[21] of
Somchai Lamatipanont, a director and shareholder of Saha Thai,
and Surasak's wife, Surang Lamatipanont.  Id. at 2, C.R. Doc. 30,
Def.'s App., Ex. 10, at 2.  Saha Thai further stated that Thai
Hong had not resumed operations after going bankrupt.  Id.

In a second post-verification questionnaire, Commerce asked
about Thai Tube Co., Ltd., ("Thai Tube") a company which seemed
to be the legal successor of Thai Hong.  Commerce's Request for
Additional Information (Mar. 24, 1997), at 1, P.R. Doc. 86,
Def.'s App., Ex. 11, at 1.  Saha Thai responded that it had "no
direct knowledge" of Thai Tube or its relationship to Thai Hong.
Saha Thai's Second Post-Verification Response to Questionnaire
(Mar. 27, 1997), at 1, C.R. Doc. 32, Def.'s App., Ex. 13, at 1.
Relying on public filings from the Thai Ministry of Commerce,

---

[21]    The March 12, 1997 response stated that Surasak and
Samarn Lamatipanont were the estranged brothers of Somchai
Lamatipanont, a director and shareholder of Saha Thai.  Saha Thai
later clarified that Surasak and Samarn were Somchai's estranged
nephews.

Saha Thai stated that Mr. Surasak and Mrs. Surang Lamatipanont were the directors of Thai Tube.  <u>Id.</u> at 3, C.R. Doc. 32, Def.'s App., Ex. 13, at 3.  Saha Thai said that Samarn was not a director of Thai Tube.  <u>Id.</u>[22]  Saha Thai listed the number of Saha Thai shares held by Mr. Somchai Lamatipanont, his wife, and his son, but stated that they held no shares in Thai Tube.  <u>Id.</u> at 4.  Saha Thai also restated that Somchai Lamatipanont was estranged from Surasak and Surang Lamatipanont, and that they had no business dealings with each other.  <u>Id.</u>

Commerce issued the preliminary results of its review on April 10, 1997 and assigned Saha Thai a substitute dumping margin of 29.89 percent, based on adverse facts available.  <u>Certain Welded Carbon Steel Pipes and Tubes from Thailand</u>, 62 Fed. Reg. 17,590, 17,595 (Dep't Commerce 1997) (preliminary results of antidumping duty admin. rev.) [hereinafter "<u>Preliminary Results</u>"].  Commerce resorted to adverse facts on the basis that Saha Thai had significantly impeded the review by failing to comply with Commerce's requests for complete information on affiliates.  Commerce found this determination appropriate under §§ 776(a)(2)(C) and 776(b) of the Tariff Act (19 U.S.C. §§ 1677e(a)(2)(C) and 1677e(b)).  <u>Preliminary Results</u>, 62 Fed. Reg. at 17,592.

_____

[22]     [                    ]

In August 1997, Commerce requested that Saha Thai place on the record of the 1995-96 review portions of its questionnaire responses from a subsequent review for 1996-97. These answers listed the percentage of shares held by various Saha Thai directors and officers, as well as further information regarding the Siam Steel Group. Saha Thai's Supplemental Response (Aug. 25, 1997), at Exs. 1-2, C.R. Doc. 50, Def.'s App., Ex. 19, at 3-11. Up to this point, Commerce had not requested a list of the officers and directors of Saha Thai. It was also at this point that the information on the two home market customers and resellers, Companies A[23] and B[24], and another home market customer, Company C[25], was placed on the record.

Commerce issued the Final Results of the Antidumping Duty Administrative Review on October 16, 1997. In the Final Results, Commerce confirmed its findings from the Preliminary Results and applied total adverse facts available to Saha Thai, assigning Saha Thai a dumping margin of 29.89 percent. Final Results, 62 Fed. Reg. at 53,821. Commerce found that Saha Thai had "significantly impeded the review by failing to comply with requests for complete information on affiliates." Id. at 53,809. Specifically, Commerce concluded that Saha Thai had failed to

---

[23]     [                    ]

[24]     [                    ]

[25]     [                    ]

disclose affiliations with Thai Tube, and three home-market customers (Companies A, B and C), two of which (A and B) were resellers of subject merchandise.  Id.  Commerce also stated that Saha Thai failed to provide complete information concerning ownership and management of the Siam Steel Group.  Id.

Commerce based its affiliation findings on 19 U.S.C. § 1677(33)(F) "by virtue of common control by several families involved in the ownership and management of Saha Thai."  Id. at 53,810.  On these grounds, Commerce's information revealed that six families hold percentages of Saha Thai's shares and hold all the seats on the Board of Directors.  Id.  Some of these family members are also officers and managers of Saha Thai.  Saha Thai's affiliations were established on the basis of the common control and financial holdings these families have in Saha Thai.

Commerce concluded that Saha Thai is affiliated with Thai Tube and Thai Hong pursuant to 19 U.S.C. § 1677(33)(F), "by virtue of common control by the Lamatipanont family."  Id. Somchai Lamatipanont is the Deputy Managing Director of Saha Thai.[26]  Commerce was unpersuaded by Saha Thai's arguments that Somchai Lamatipanont lacked day-to-day managerial control of Saha

_____

[26]    The Preliminary Results incorrectly stated that Somchai Lamatipanont was the Managing Director of Saha Thai.  Saha Thai submitted evidence on the record after the Preliminary Results indicating that Somchai Lamatipanont is the Deputy Managing Director, and Somchai Karuchit is the Managing Director.  Final Results, 62 Fed. Reg. at 53,812-813.

Thai.  Rather, as the officer second to the managing director, Commerce stated that Somchai Lamatipanont would "normally" be in a position of control.  Id. at 53,813.

The Lamatipanont family was found to be in a position of "legal and operational" control of Thai Tube and Thai Hong because of its ownership and control interests in the two companies.  Surasak Lamatipanont and his wife Surang Lamatipanont are Thai Tube's only directors, and Surasak is the nephew of Somchai Lamatipanont.  Commerce found Thai Hong was controlled by the same Lamatipanont family, through Surasak, his wife, and his brother, Samarn.  Public information disclosed that 98.75 percent of Thai Hong's shares were owned by individuals with the surname Lamatipanont.  Id.

Commerce also determined that Saha Thai is affiliated with the three home market customers revealed during verification, Companies A, B, and C.  Companies A and B are also resellers of subject merchandise.  Saha Thai admitted that the families of three Saha Thai directors exercise positions of control in these three companies.  Final Results, 62 Fed. Reg. at 53,814.  Sales to these three home market customers represented more than 5 percent of Saha Thai's total home market sales during the POR. Id. at 53,815.[27]

---

[27]      [                              ]

Saha Thai conceded that the Sae Heng/Ratanasirivilai family has an ownership interest in Company A, sufficient to establish its control over this company.  Id.[28]  Commerce found that this family also has an ownership interest in Saha Thai, that it possesses two seats on Saha Thai's board of directors, and that Mr. Kim Hua Sae Heng is the Financial Director of Saha Thai.[29]  Final Results, 62 Fed. Reg. at 53,815; Saha Thai's Corrective Supplemental Response (Sept. 8, 1997), at 2, P.R. Doc. 129, Def.'s App., Ex. 21, at 3.

Saha Thai also conceded that the Lamatipanont family has "substantial ownership interest" in Company B.  Final Results, 62 Fed. Reg. at 53,815.[30]  Somchai Lamatipanont, as discussed above, is the Deputy Managing Director of Saha Thai and a member of the Board of Directors.  The Lamatipanont family owns an equity interest in Saha Thai.  Final Results, 62 Fed. Reg. at 53,815. Commerce thus concluded that Company B and Saha Thai are under the common control of the Lamatipanont family.

---

[28]      [                    ]

[29]      Saha Thai admitted that Mr. Sae Heng is "one of the three Saha Thai officers who, together with one of the other officials can bind Saha Thai with his signature."  Final Results, 62 Fed. Reg. at 53,815; Revised Exhibit 3 to Saha Thai Submission (Oct. 2, 1997), at Ex. 3, P.R. Doc. 133, Def.'s App., Ex. 23, at 8.

[30]      [                    ]

Saha Thai further conceded that the Ampapankit family controls Company C.  Id.[31]  This family also has an ownership interest in Saha Thai.  Limsiam Ampapankit is the Chairman of the Board of Saha Thai, as well as a director and shareholder.[32] Commerce therefore decided that Company C and Saha Thai are under the common control of the Ampapankit family.

Commerce also found that Saha Thai is affiliated with Company D, another home market customer, and Company E, a home market customer and producer of steel pipe, because of their membership in the Siam Steel Group.  Final Results, 62 Fed. Reg. at 53,816.  Commerce found that the Siam Steel Group is a "corporate or family grouping" due to the control of the member companies by the Karuchit/Kunanuantakul family.  Id.  Saha Thai had acknowledged a potential affiliation between certain Siam Steel Group companies and Saha Thai, in response to Commerce's initial questionnaire.  See Proprietary Questionnaire Responses (July 16, 1996), at 6-7, C.R. Doc. 2, Def.'s App., Ex. 4, at 8-9.[33]  Commerce claims it did not conduct a full analysis of

---

[31]     [                    ]

[32]     Saha Thai admitted that Mr. Ampapankit is "one of the three Saha Thai officers who, together with one of the other officials can bind Saha Thai with his signature."  Final Results, 62 Fed. Reg. at 53,815; Revised Exhibit 3 to Saha Thai Submission (Oct. 2, 1997), at Ex. 3, P.R. Doc. 133, Def.'s App., Ex. 23, at 8.

[33]     [                    ]

affiliation within the Siam Steel Group due to insufficient information.  Commerce nevertheless found it reasonable to conclude that Companies D and E are affiliated with Saha Thai due to their common membership in the Siam Steel Group.  Final Results, 62 Fed. Reg. at 53,816.[34]  The finding of affiliation with Company E did not further effect the final results because Commerce concluded that the products manufactured by Company E did not fall within the scope of the review.  Id. at 53,817.

Commerce stated that the existence of these affiliations was placed on the record too late to obtain additional information necessary to analyze whether or not Saha Thai, Thai Tube and Thai Hong should be collapsed.  Id. at 53,814.  Saha Thai had argued that there was substantial evidence on the record to show that collapsing would not be appropriate.  Commerce drew the adverse inference that it was "appropriate to collapse Saha Thai, Thai Tube, and Thai Hong" because Saha Thai "impeded the investigation by failing to disclose relevant information" concerning these affiliations.  Id.  Commerce also stated that the failure to identify the resellers as affiliated prevented Commerce from

---

[34]    Mr. Karuchit, Saha Thai's Managing Director, is also the Chairman of Siam Steel International, Saha Thai's largest shareholder.  During verification, Saha Thai "noted ... that Siam Steel International has investments in 11 of the other members of the Siam Steel Group."  Final Results, 62 Fed. Reg. at 53,816.

obtaining information on downstream sales prices and calculating normal value for these sales.  Id. at 53,815.

Commerce assigned Saha Thai a dumping margin of 29.89 percent, the margin applied to Thai Union in Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand, 56 Fed. Reg. 58,355 (Dep't Commerce 1991) (final results of antidumping duty admin. rev.) (calculated margin of 38.51 percent assigned to Thai Union); Circular Welded Carbon Steel Pipes and Tubes from Thailand, 59 Fed. Reg. 65,753 (Dep't Commerce 1994) (amended final results of antidumping admin. rev.) (Thai Union revised weighted-average margin of 29.89 percent on remand from Court of International Trade).

Ferro Union argues that Commerce's findings should be reversed, and asserts four grounds for reversal.  Ferro Union first contends that Commerce misconstrued the new affiliation definition in the URAA.  Ferro Union states that even if the affiliation determination was lawful, the resort to total adverse facts was unlawful because Commerce disregarded the new statutory requirements prior to applying adverse facts.   Ferro Union next asserts that Commerce should not have applied adverse facts because there was sufficient record evidence to conduct a collapsing analysis.  Lastly, Plaintiffs argue that Commerce failed to corroborate the secondary information used as adverse facts, and applied an uncorroborated dumping margin.

The court will address each of these arguments in turn.

## Discussion

Several URAA amendments to the antidumping statute are at issue in this case.  In reviewing Commerce's construction of the statute, the court must first look at "whether Congress has directly spoken to the precise question at issue."  Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43.  If the statue is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Id. at 843.

### A)   Affiliations

Prior to the URAA, the antidumping laws contained two definitions for "related parties" in 19 U.S.C. § 1677(13)(1988) and 19 U.S.C. § 1677b(e)(4)(1988).  The URAA amended 19 U.S.C. § 1677b(e)(4) to create 19 U.S.C. § 1677(33) entitled "Affiliated Persons," which added section (G) and a definition of control. This section now provides:

> The following persons shall be considered to be "affiliated" or "affiliated persons":

> (A)  Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.
> (B)  Any officer or director of an organization and such organization.
> (C)  Partners.
> (D)  Employer and employee.
> (E)  Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
> (F)  Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
> (G)  Any person who controls any other person and such other person.
>
> For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

19 U.S.C. § 1677(33)(1994).  The Statement of Administrative Action to the URAA states that these changes were made in order to address the realities of the marketplace.  Statement of Administrative Action, accompanying H.R. 103-5110 at 838 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 4174 ("SAA") (the "traditional focus on control through stock ownership fails to address adequately modern business arrangements ... [and] including control in the definition of 'affiliated' will permit a more sophisticated analysis which better reflects the realities of the marketplace.").[35]

---

[35]  The Statement of Administrative Action represents "an authoritative expression by the Administration concerning its

(continued...)

Commerce's regulations adopted this same definition of "affiliated persons".  See 19 C.F.R. § 351.102(b) (1998) ("Affiliated persons" and "affiliated parties" have the same meaning as in section 771(33) of the Act [19 U.S.C. § 1677(33)].").  In its Notice of Proposed Rulemaking, Commerce explained that "affiliated persons" is a new term and clarified that "affiliated person" and "affiliated parties" have the same meaning.  Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308, 7,310 (Dep't Commerce 1996) (notice of proposed rulemaking and request for public comments) (proposed regulations to conform to the URAA).  Commerce declined to elaborate on the meaning of either "control" or "affiliated persons."  "'Affiliated persons' is a new statutory term embodying new concepts, and the complexity of the relationships potentially covered by this term mitigates against the issuance of detailed regulations at this time."  Id. at 7,310.  Commerce declined further detail on this concept in its Final Regulations, stating that it was "more appropriate" for Commerce to develop its practice regarding affiliation "through the adjudication of actual cases."

---

[35](...continued)
views regarding the interpretation and application of the Uruguay Round Agreements ... The Administration understands that it is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this statement."  SAA, at 1 (quoted in Delverde, SrL v. United States, 989 F. Supp. 218, 229 n.18 (Ct. Int'l Trade 1997)).

<u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. 27,296, 27,297 (Dep't Commerce 1997) (final rules).  The definition of "affiliated persons" in the "Glossary of Terms" attached to the first questionnaire Commerce sent to Saha Thai said "antidumping law subjects transactions between affiliated persons to special scrutiny," but then restated the elements of 19 U.S.C. § 1677(33) without elaboration.  <u>Questionnaire</u> (undated), at App. 1, P.R. Doc. 138, Def.'s App., Ex. 3, at 21.

Plaintiffs allege that Commerce improperly interpreted this new affiliation standard in several ways in its review of Saha Thai.  Ferro Union asserts that Congress spoke directly to the meaning of affiliates in 19 U.S.C. § 1677(33), and that under <u>Chevron</u>, Commerce's interpretation is not entitled to deference. As the comments to Commerce's proposed regulations and final regulations make clear, however, "affiliated persons" was a new statutory term which would require further interpretation. Commerce chose to develop this interpretation on a case-by-case basis.  One question for the court is whether Commerce's construction of affiliates is permissible.

The court will analyze the four specific challenges Plaintiffs raise to Commerce's interpretation of affiliated persons under 19 U.S.C. § 1677(33).

1)   The definition of "control"

Plaintiffs contest Commerce's findings regarding "control" in two instances.  First, Plaintiffs contest Commerce's finding that six families controlled Saha Thai.  Secondly, they challenge Commerce's determination that Somchai Lamatipanont controlled Saha Thai in his position as Deputy Managing Director.

Plaintiffs express incomprehension over how several families could be considered to control Saha Thai.  The plain language of the statute, along with the SAA, make it clear that "control" for purposes of 19 U.S.C. § 1677(33) does not require a finding of <u>actual</u> control; rather one controls if one is "legally or operationally in a position to exercise restraint or direction over the other person."  <u>See</u> 19 U.S.C. § 1677(33).  The determination of "control" under the URAA is thus not dependent on actually exercising control, but rather on the <u>capacity</u> to exercise control.

The SAA stated that the "traditional focus of control through stock ownership fail[ed] to address adequately modern business arrangements."  SAA at 838.  The new definition of "control" thus permits a finding that several persons or groups are in a position to exercise restraint or direction over a company.  Furthermore, Commerce's regulations stated that in making a determination regarding control, Commerce would consider "corporate or family groupings" among other factors.  19 C.F.R. §

351.102(b) (1998).  There is record evidence that several families have an ownership interest in Saha Thai, through their stockholdings, and that all of Saha Thai's officers and directors are members of these six families.  Saha Thai's Corrective Supplemental Response (Sept. 8, 1997), at 1-2, P.R. Doc. 129, Def.'s App., Ex. 21, at 2-3.  Assuming that the evidence is substantial, it would not violate the statute to find that the six families in a position to exercise "restraint or control over Saha Thai" in fact control Saha Thai.  But see discussion infra (regarding whether Commerce properly defined these families).

Likewise, Plaintiffs contest Commerce's finding that Somchai Lamatipanont "controlled" Saha Thai because they claim there is no record evidence that Somchai Lamatipanont exercised day-to-day control over the company.  Commerce initially believed that Somchai Lamatipanont was the Managing Director of Saha Thai, but Saha Thai submitted information after the Preliminary Results indicating that Mr. Lamatipanont was the Deputy Managing Director.  Final Results, 62 Fed. Reg. at 53,812; Saha Thai's Corrective Supplemental Response (Sept. 8, 1997), at 2, P.R. Doc. 129, Def.'s App., Ex. 21, at 3.  In its case brief, Saha Thai had argued that Mr. Lamatipanont was only a member of the Board of Directors, and failed to state that he was Deputy Managing Director.  Final Results, 62 Fed. Reg. at 53,813.  In its submission in August 1997, Saha Thai argued that only the

Managing Director, Mr. Karuchit, exercises day-to-day control over Saha Thai's operations.  See id.; Saha Thai's Supplemental Response (Aug. 25, 1997), at Ex. 2, C.R. Doc. 50, Def.'s App., Ex. 19, at 5.  Commerce found, however, that Saha Thai had "offered no evidence to support its assertion that all [positions other than Managing Director] are devoid of any responsibility over either day-to-day operating decisions or major management decisions."  Final Results, 62 Fed. Reg. at 53,813.  Commerce then concluded that a deputy managing director is "normally in a position of control."  Id.

Commerce also had evidence of Somchai Lamatipanont's shareholdings in Saha Thai, and his directorship position.  In light of the fact that the statute only requires that a control person be in a position to exercise restraint or direction, and does not require evidence that such a person actually does control a company, it was not unreasonable for Commerce to conclude that Somchai Lamatipanont is in a position to restrain or direct Saha Thai, and thus, is in a position of control.

2) Meaning of family

Ferro Union challenges the meaning of "family" for purposes of 19 U.S.C. § 1677(33)(A).  Plaintiffs assert that the statute only foresees that nuclear family members and linear descendants are "family."  The sub-section provides that "members of a family, including brothers and sisters (whether by the whole or

half blood), spouse, ancestors, and lineal descendants" are affiliated.  19 U.S.C. § 1677(33)(A).

Plaintiffs focus their argument on the finding that the Lamatipanont family controls Saha Thai, Thai Tube, and Thai Hong. Plaintiffs assert that Somchai Lamatipanont and his nephews, Surasak and Samarn, are not covered under the definition of "family" under 19 U.S.C. § 1677(33)(A).  Plaintiffs argue that if any relations other than those explicitly listed in (33)(A) are to be included in the definition of family, they can only be nuclear family or lineal relations.  The Government and Wheatland focus on the word "including" in 19 U.S.C. § 1677(33)(A), as providing room for Commerce to conclude that family members not listed in section (A) can still be considered "family" under the statute.

The word "including" in section (A) of 19 U.S.C. § 1677(33) is an indication that Congress did not intend to limit the definition of "family" to the members listed in this section. Had Congress intended this list to be definitive, it would have chosen different wording.  The wording it did choose evinces an illustrative intent. Commerce's interpretation of this section is reasonable and therefore not subject to reversal by the court.

The Plaintiffs and Wheatland debate whether uncles and nephews can be considered "family" under an ordinary definition of "family."  The court agrees with Wheatland that the plain

meaning of "family" includes uncles and nephews.  See Black's Law Dictionary 604 (6th ed., 1990) ("family" may mean "all descendants of a common progenitor ... those who are of the same lineage.").

Ferro Union also focuses on the claim that Somchai is estranged from his nephews as a means to distinguish them from the definition of family.  Neither the statute, nor the regulations, provide for an exception to family for members who are estranged.  If the court were to find that estranged relatives are not members of the same family, it would invite parties in administrative reviews to assert subjective criteria for determining familial relationships.  In the absence of Congressional intent to make the family determination based on such subjective criteria, the court will not inject into the inquiry a test which is not administrable.

Although it is statutorily permissible for Commerce to conclude that an uncle and his nephews are "family" for purposes of the statute, Saha Thai was provided with insufficient notice that this relationship was included in the definition of family.  Commerce bears the responsibility of asking clear questions, and Saha Thai could not be expected to guess at the meaning and full scope of "family."  See NSK Ltd. v. United States, 19 CIT 1319, 1328, 910 F. Supp. 663, 671 (1995) ("[r]espondents should not be required to guess the parameters of Commerce's interpretation of

a phrase in the statute.").  Accordingly, Commerce could not legitimately expect Saha Thai to provide this information without specific direction that uncles and nephews are considered family.

     3)    The Family as a "person"

Plaintiffs assert that a family cannot be considered a "person" for purposes of 19 U.S.C. § 1677(33)(F),[36] in order to justify Commerce's findings that Saha Thai is affiliated with the various companies by virtue of the common control of a family. As Plaintiffs correctly note, 19 U.S.C. § 1677(33) does not contain a definition of "person," nor does the general definitions section of the URAA.  See 19 U.S.C. § 3501 (1994).

Commerce's regulations define "person" as "any interested party, as well as any other individual, enterprise, or entity, as appropriate."  19 C.F.R. § 351.102(b) (1998).[37]  Plaintiffs assert that none of these examples can encompass a family.  On the contrary, a family can reasonably be considered an "entity" or an "enterprise" because family members likely share a common interest.

_____

[36]    Sub-section (F) of 19 U.S.C. § 1677(33) provides "two or more persons directly or indirectly controlling, controlled by, or under common control with, any person" are affiliated persons.

[37]    This is the same definition as found in Commerce's earlier regulations.  See 19 C.F.R. § 353.2(p) (1995-1997).

Plaintiffs also argue that the use of the singular "person" at the end of 19 U.S.C. § 1677(33)(F), as contrasted to the plural at the beginning of the sentence, evinces Congress' intent that "person" be interpreted only as a single individual.  The court, however, finds that the singular word "person" can be interpreted to encompass a "family" in order to carry out the intent of the statute.  See First Nat'l Bank in St. Louis v. Missouri, 263 U.S. 640, 657 (1924) ("words importing the singular may [not] extend and be applied to several persons or things ... except where it is necessary to carry out the evident intent of the statute") (emphasis added).  As previously discussed, the intent of 19 U.S.C. § 1677(33) was to identify control exercised through "corporate or family groupings."  SAA at 838.  By interpreting "family" as a control person, Commerce was giving effect to this intent.

Once Commerce determined that the Sae Heng/Ratanasirivilai family controlled both Saha Thai and Company A, logically 19 U.S.C. § 1677(33)(F) led Commerce to determine that these companies were affiliated because of the family's control.  The determination that the Lamatipanont family controlled Company B, and that the Ampapankit family controlled Company C, also logically led to the conclusion that these companies are affiliated with Saha Thai.

Nevertheless, it is unclear how Commerce defined these families. It seems that Commerce concluded that anyone with the same surname was a member of the same family. On remand, Commerce should inform itself of the nature of the relationships among these people in order to assure itself that it has properly determined that the persons involved are family members as contemplated by the statute, and that the affected companies should have been identified by Saha Thai.

4) "Affiliates of affiliates" as affiliates

Plaintiffs allege that Commerce went beyond the enumerated definitions of "affiliates" and extended the definition to "affiliates of an affiliate."[38] Under this argument, Saha Thai would not be affiliated with Companies A, B, and C, simply because they are each affiliated with one of the family groupings.

In support of its position, Plaintiffs rely on a public briefing by Commerce regarding the new affiliation standard, held on June 18, 1997. See Pl. Br., Att. 2. In this overview, Commerce presented three scenarios for affiliation. In scenario 2, A holds a 50 percent interest in B, and a 10 percent interest

---

[38] This court will not uphold an extra-statutory definition of "affiliate." See Delverde, 989 F. Supp. at 224 (court will not "read into the substantive law [a] definitional provision when there is neither implicit or explicit reference to it and no other support for such a reading.")

in C.  Commerce stated that under this scenario "A is affiliated with B and A is affiliated with C, this does not mean that B and C are affiliated."  Id. at 3.  Scenario 3 provided an example where A has a controlling equity interest in both B and C, "therefore, B and C are affiliated."  Id. at 4.  Plaintiffs try to equate Commerce's affiliation findings in this case with scenario 2.  Commerce, however, found that each family controls both Saha Thai and the affiliated company.  Therefore, Commerce's findings are akin to scenario 3 and no new affiliation standard has been created.

Plaintiffs also cite Queen's Flowers de Colombia v. United States, 981 F. Supp. 617 (Ct. Int'l Trade 1997), where the court found that companies which were not directly related under the terms of 19 U.S.C. § 1677(13)(1988) could not be related by means of a string of related parties.[39]  Queen's Flowers dealt with the affiliation standard under the pre-URAA statute, and even under that standard, the court found several companies affiliated by

---

[39]     In Queen's Flowers, Mr. X owned 25 percent of MG.  MG owned a 20 percent share of six subsidiary companies.  X owned 33 percent of Company Z, so Company Z and MG were related under 19 U.S.C. § 1677(13)(D)(1988).  Mr. X also owned 10 percent of Company Y, so X and Y were related under 19 U.S.C. § 1677(13)(B)(1988).  Neither Z nor Y, however, were related to MG's subsidiary companies in which MG owned a 20 percent share, because Mr. X's "indirect ownership interests" in these companies were less than 20 percent.  Therefore, there was no "person or persons who own[ed] directly or indirectly at least 20 percent" of Z or Y and the MG subsidiaries.  Queen's Flowers, 981 F. Supp. at 625.

aggregating the ownership interests of two brothers.  Queen's
Flowers, 981 F. Supp. at 626.

In this case, Commerce did not create a new category of
affiliated persons under 19 U.S.C. § 1677(33)(1994).  Commerce
found that Saha Thai and the three home market customers are
directly controlled by three families.  Likewise, Commerce found
that Saha Thai and the Siam Steel Group are controlled by the
Karuchit/Kunanuantakul family.  These companies, thus, would be
affiliated under 19 U.S.C. § 1677(33)(F) ("two or more persons
directly or indirectly ... controlled by, or under common control
with, any person" are affiliated parties).

Therefore, the court concludes that all of Commerce's
interpretations regarding "affiliated persons" were permissible.
Even though the court's analysis leads it to conclude that
Commerce's interpretation of this new statutory term was
reasonable, it was not proper for Commerce to expect Saha Thai to
foresee the full interpretation of a term which was undergoing
development.  Saha Thai cannot be faulted for failing to comply
with Commerce's interpretation of an admittedly complex, and as
yet unexplained, concept.  The court finds this to be
particularly true with regards to the affiliation of Thai Tube
and Thai Hong.  Without more detailed questions from Commerce,
Saha Thai had no reason to reveal a company owned by the nephews
of one of its directors as an affiliate.  Therefore, on remand,

even if Commerce concludes that it has properly understood the familial relationships, Commerce must exclude any affiliation finding between Saha Thai and Thai Tube/Thai Hong from its analysis of whether it should resort to total adverse facts available.

**(B)   Total Adverse Facts Procedure**

Ferro Union argues that Commerce's resort to total adverse facts available was unlawful because Commerce disregarded the new statutory standard for applying adverse facts, pursuant to 19 U.S.C. § 1677e(b)(1994).  Section 1677e provides in relevant part:

**Determinations on basis of facts available**

**(a)   In General**
If –
    (1) necessary information is not available on the record, or
    (2) an interested party or any other person –
        (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
        (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections(c)(1) and (e) of section 1677m of this title,
        (C) significantly impedes a proceeding under this subtitle, or
        (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,

the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

**(b)  Adverse inferences**

If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.  Such adverse inference may include reliance on information derived from –
(1) the petition,
(2) a final determination of the investigation under this subtitle,
(3) any previous review under section 1675 of this title or determination under section 1675b of this title, or
(4) any other information placed on the record.

19 U.S.C. § 1677e (1994).  As this court clarified in Borden, Inc. v. United States, 4 F. Supp. 2d 1221 (Ct. Int'l Trade 1998), Commerce may not automatically resort to adverse inferences once it decides that a party has failed to comply with its requests. Borden, 4 F. Supp. 2d at 1246.

The URAA amended 19 U.S.C. § 1677e(a)(1988) to conform to the requirements of Article 6.8 and Annex II of the Agreement on Implementation of Article VI of the GATT 1994.  See Borden, 4 F. Supp. 2d at 1244.  Under 19 U.S.C. § 1677e(a) (1994), Commerce will apply facts available when necessary information is not available on the record or when a party (A) withholds information that Commerce has requested, (B) fails to provide information in a timely fashion or in the form requested, (C) significantly

impedes the proceeding, or (D) provides information which cannot be verified in accordance with 19 U.S.C. § 1677m(i).  19 U.S.C. § 1677e(a).  The use of facts available is subject to the requirements of 19 U.S.C. § 1677m(d), that a party have a chance to remedy deficient submissions.[40]

Sub-parts (a) and (b) of 19 U.S.C. § 1677e make a distinction between resort to "facts available" (sub-part (a)) and resort to an adverse inference (sub-part (b)).  Once Commerce has determined under 19 U.S.C. § 1677e(a) that it may resort to facts available, it must make additional findings prior to applying 19 U.S.C. § 1677e(b) and drawing an adverse inference.

_____

[40]   Section 1677m(d) provides:

**(d)  Deficient submissions**

If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle.  If that person submits further information in response to such deficiency and either -
        (1) the administering authority or the Commission (as the case may be) finds that such response is not satisfactory, or
        (2) such response is not submitted within the applicable time limits,

then the administering authority or the Commission (as the case may be) may, subject to subsection (e) of this section, disregard all or part of the original and subsequent responses.

Commerce must find that a party "failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b); see also Borden, 4 F. Supp. 2d at 1246.[41]  Under the URAA, Commerce is now required to make more subtle judgments than under the previous best information available ("BIA") standard.  The antidumping statute may now be less administratively convenient, but Commerce must conform its administrative reviews to the new provisions.  In this case, Commerce did not comply with the required steps of 19 U.S.C. § 1677e prior to applying adverse facts available.

In the Preliminary and the Final Results, Commerce stated it was applying total adverse facts available pursuant to both 19 U.S.C. § 1677e(a)(2)(C) and § 1677e(b), because Saha Thai had significantly impeded the review by "failing to comply with [Commerce's] requests for complete information on affiliates." Preliminary Results, 62 Fed. Reg. at 17,592; Final Results, 62 Fed. Reg. at 53,809.  "Significantly impeding the review" is only sufficient grounds to warrant an application of facts available

_____

[41]     The SAA states that although the URAA changed the terminology of the former best information available ("BIA") rule, resort to facts available remains "an essential investigative tool in antidumping and countervailing duty proceedings."  SAA at 868.  The use of adverse inferences conforms to the Antidumping Agreement and current practice.  SAA at 870.  When a party is uncooperative, Commerce "may employ adverse inferences about the missing information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."  Id.

pursuant to 19 U.S.C. § 1677e(a)(2)(C).[42]  The additional finding

that a party failed to comply "to the best of its ability" must

be made to warrant an application of adverse facts under 19

U.S.C. § 1677e(b).  See Borden, 4 F. Supp. 2d at 1246.  In

Borden, Commerce "simply repeated its 19 U.S.C. § 1677e(a)(2)(B)

finding, using slightly different words."  Id.  The court

concluded this was an insufficient basis for drawing an adverse

inference.

In this case, Commerce also repeated its 19 U.S.C. §

1677e(a)(2)(C) finding to determine that Saha Thai's responses

evinced an inability to comply to the best of its ability,

pursuant to 19 U.S.C. § 1677e(b).  In the Preliminary Results,

Commerce said that Saha Thai failed to act to the best of its

ability, on the basis that Saha Thai had "demonstrated an

understanding of the affiliated party definition."  Preliminary

Results, 62 Fed. Reg. at 17,593.  In determining whether to rely

---

[42]    Under the post-URAA standard, this is not a sufficient
finding for applying adverse facts available, although it was
sufficient under the former BIA rule.  See Olympic Adhesives,
Inc. v. United States, 899 F.2d 1565, 1572 (Fed. Cir. 1990)
(partial completeness in responding to Commerce request "may
justify resort to the best information rule.");  Mitsubishi Heavy
Indus., Ltd. v. United States, 17 CIT 1024, 1031, 833 F. Supp.
919, 926 (1993) ("Commerce may resort to BIA 'whenever a party
... refuses or is unable to produce information requested ... or
otherwise significantly impedes an investigation'.");  Ansaldo
Componenti, S.p.A. v. United States, 10 CIT 28, 36, 628 F. Supp.
198, 205 (1986) (failure to furnish information requested
justified Commerce's use of best information available.).

on information provided by Saha Thai, Commerce allegedly analyzed

Saha Thai's information in conformity with 19 U.S.C. § 1677m(e).

Id. at 17,593.[43]

In the Final Results, Commerce said it was applying total

adverse facts available because Saha Thai "significantly impeded

the review," and cited 19 U.S.C. § 1677e(a)(2)(C) and 19 U.S.C. §

1677e(b). Final Results, 62 Fed. Reg. at 53,809.  Commerce did

not state that it was applying sub-section (b) on the ground that

Saha Thai failed to act to the best of its ability.  Commerce can

not cite to 1677e(b) for the application of total adverse facts

when it has only concluded that a party has significantly impeded

---

[43]     Section 1677m(e) provides:

**(e) Use of certain information**

In reaching a determination under section 1671b, 1671d,
1673b, 1673d, 1675, or 1675b of this title the administering
authority and the Commission shall not decline to consider
information that it is submitted by an interested party and is
necessary to the determination but does not meet all the
applicable requirements established by the administering
authority or the Commission, if -
       (1) the information is submitted by the deadline
    established for its submission,
       (2) the information can be verified,
       (3) the information is not so incomplete that it cannot
    serve as a reliable basis for reaching the applicable
    determination,
       (4) the interested party has demonstrated that it acted
    to the best of its ability in providing the information and
    meeting the requirements established by the administering
    authority or the Commission with respect to the information,
    and
       (5) the information can be used without undue
    difficulties.

the review.[44]  The only mention of the 1677e(b) standard came

after the Department stated its position on Saha Thai's various

affiliates.  The Department stated, "[g]iven Saha Thai's failure

to identify Company A, Company B, and Company C as affiliates, we

continued to find that Saha Thai failed to act to the best of its

ability to comply with our requests for information on

affiliates."  Final Results, 62 Fed. Reg. at 53,815.  Commerce

did not reference 19 U.S.C. § 1677e(b) at this point.  Rather, it

cited a Memorandum to the File, dated October 7, 1997.  This

memorandum neither states the requirements of 19 U.S.C. §

1677e(b) nor states that Saha Thai failed to act to the best of

its ability.  See Memorandum to File: Analysis for Final Results

(Oct. 7, 1997), C.R. Doc. 55, Def.'s App., Ex. 24.  This

memorandum only reiterates Commerce's conclusion that Saha Thai

significantly impeded the review by failing to provide full

information on affiliates.  Moreover, mere recitation of the

relevant standard is not enough for Commerce to satisfy its

obligation under the statute.  Borden, 4 F. Supp. 2d at 1246.

---

[44]    Although these two standards, "significantly impeding"
and "failing to cooperate to the best of its ability", appear
quite similar, there is a statutory distinction, and only the
latter leads to the application of adverse facts.  Impeding the
review does not have to be read negatively.  A respondent could
impede a review without intending to do so, for example, because
it did not understand the questions asked.  The statute requires
an additional finding under Section 1677e(b) that a respondent
could have complied, and failed to do so.

Although in the Preliminary Results, Commerce used the language of 19 U.S.C. 1677e(b) to justify its application of total adverse facts available, and applied some rudimentary reasoning, the court is reluctant to incorporate the statement of the Preliminary Results into the Final Results where, as here, Commerce placed additional information on the record after the Preliminary Results.[45]  The Preliminary Results, by their nature, and given Commerce's additional inquires, were subject to change. NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("preliminary determinations are preliminary precisely because they are subject to change."); Peer Bearing Co. v. United States, 12 F. Supp. 2d 445, 456 (Ct. Int'l Trade 1998) (Commerce has flexibility to change position from preliminary determination to final results ... "preliminary results, by their very nature, are preliminary and subject to change.") (citing Tehnoimportexport v. United States, 15 CIT 250, 254-55, 766 F. Supp. 1169, 1174-75 (1991)).  The Preliminary Results, assuming arguendo that they were sufficient at the time, cannot be relied upon to fill the gaps in reasoning of the Final Results.

---

[45]    As discussed above, Commerce requested that Saha Thai place information on the record of the 1995-96 review which Saha Thai had already submitted in a subsequent review for 1996-97. Commerce made this request in August 1997, four months after issuing the Preliminary Results.  Commerce Letter to Saha Thai (Aug. 21, 1997), P.R. Doc. 121, Def.'s App., Ex. 18.

Commerce is obliged to explain why it concluded that a party failed to comply to the best of its ability prior to applying adverse facts, and it did not do so here.  The Government and Wheatland cite record evidence to support the conclusion that Saha Thai expressed an unwillingness to comply with Commerce's requests.  They also argue that if Saha Thai was truly confused regarding the meaning of "affiliated parties," it had the responsibility to seek clarification from Commerce.  See Yamaha Motor Co., Ltd. v. United States, 19 CIT 1349, 1358, 910 F. Supp. 679, 686 (1995) ("if the instructions were confusing, [respondent] should have sought clarification from Commerce.")[46] Plaintiffs counter that Commerce's initial questionnaire gave Saha Thai no notice as to the importance of the new definition of affiliates.  By contrast, the initial questionnaire did signal an amendment in the Department's practice regarding the determination of the date of sale.  Questionnaire (undated), at 2, P.R. Doc. 138, Def.'s App., Ex. 3, at 2.  The court finds that Commerce has not pointed to substantial evidence which shows that the failure to identify Companies A, B, C, D, and E was a failure by Saha Thai to comply to the best of its ability.

---

[46]    In Yamaha, the court expressly found that Commerce's instructions were clear.  Yamaha, 19 CIT at 1358, 910 F. Supp. at 686.

As discussed supra, the court finds that Commerce's interpretation of "affiliated persons" was permissible, but this does not mean Saha Thai could be expected to understand the full implications of this new statutory provision.  Commerce itself recognized the complexity of this provision in its Proposed Regulations.  Saha Thai, as one of the first respondents in a case applying the new standard, should not be faulted for failing to understand the full ramifications of "affiliated persons." Commerce should avoid asking questions which require a respondent to guess at its implications.  See Queens Flowers, 981 F. Supp. at 628 (an "alleged response deficiency cannot support [the] application of BIA where the information sought was apparently never requested.") (citing Olympic Adhesives, Inc. v. United States, 899 F.2d 1565, 1572-75 (Fed. Cir. 1990)).

As indicated, Commerce could not legitimately expect Saha Thai to provide information about Thai Tube or Thai Hong.  On remand, Commerce must focus on whether the failure to disclose potential affiliations with Companies A, B, C, and D, as well as the failure to state that Company E produced PVC lined steel water-pipe, warrants a conclusion that Saha Thai failed to comply to the best of its ability.  In order to apply adverse facts available, Commerce must be explicit in its reasoning, and conclude that Saha Thai knew that Companies A, B, C, D, and E

could be considered affiliates and deliberately chose not to disclose them as such.

Commerce must also explain why the absence of this information is of significance to the progress of the investigation. Commerce stated in the Final Results that the lack of information regarding Companies A and B hindered Commerce from requesting downstream sales data for the sales to A and B, which prevented the Department from calculating normal value pursuant to 19 U.S.C. § 1677b(a)(5). Final Results, 62 Fed. Reg. at 53,815. Commerce also stated that it was unable to examine the common management and ownership of Saha Thai with the Siam Steel Group. Id. at 53,816-17. Nonetheless, the court cannot conclude that this alone was a significant impediment, given Commerce's misunderstanding of what it could properly expect of Saha Thai. Further, Commerce did not elaborate on the ramifications of the failure to identify Companies C and D, and ultimately determined that Company E did not produce subject merchandise. If overall the failure to identify these companies was of no significance to the progress of the investigation, then Commerce cannot apply total adverse facts on the basis of the non-identification of these companies.

On remand Commerce will not regard the failure to identify Thai Hong and Thai Tube as a deliberate effort to impede the investigation, or as grounds to conclude that Saha Thai failed to

act to the best of its ability.  It will decide whether it adequately defined affiliates for the purposes of identification of Companies A, B, C, D, and E, whether lack of identification of these companies impeded the investigation, and whether adverse facts are warranted based on failure to act to the best of ability, given the development of the law and the facts of this case.

**(C)  Calculation of the Dumping Margin**

Plaintiffs next argue that there was sufficient evidence on the record to calculate a dumping margin.  Ferro Union states that Commerce should have done a collapsing analysis, rather than collapse Saha Thai with Thai Tube and Thai Hong without analysis. Commerce justified collapsing Saha Thai with Thai Tube and Thai Hong on the basis that the record was "incomplete" rendering the Department unable to perform the collapsing inquiry.  Final Results, 62 Fed. Reg. at 53,814.[47]  Commerce, "therefore [made] the adverse inference" that it was "appropriate to collapse Saha Thai, Thai Tube, and Thai Hong."  Id.

Plaintiffs also argue that there was sufficient evidence on the record for Commerce to calculate a dumping margin without including reference to the resale prices of Companies A and B.

---

[47]     If the record is "incomplete" only because Commerce did not specifically ask questions related to Thai Tube/Thai Hong, as indicated above, this conclusion would be inadequate and Commerce must request the data.

Commerce claims these sales failed its standard arms-length pricing test – a test which Saha Thai challenged.  Id. at 53,817. Commerce says that because sales to these companies exceeded 5 percent of total home market sales, under its standard practice, Commerce would have requested downstream sales data in order to calculate normal value for these sales.  Id. at 53,815.

These issues may be mooted by or subsumed into Commerce's remand determinations and will not be decided at this stage.

**(D)  Corroboration of secondary information for calculating the antidumping margin**

Ferro Union's final argument is that Commerce unlawfully disregarded the statutory requirement that secondary information be corroborated, when it applied the 29.89 percent dumping margin to Saha Thai.[48]  Pursuant to 19 U.S.C. § 1677e(c)(1994), Commerce must corroborate secondary information "to the extent

---

[48]     The Government argues that Ferro Union is precluded from raising this argument, because Saha Thai did not raise this issue during the administrative review.  Ferro Union counters that Saha Thai contested the margin itself and Commerce's methodology in arriving at the 29.89 percent margin.
Commerce did consider the question of which adverse margin it should apply, and discussed corroboration in the Preliminary Results.  Preliminary Results, 62 Fed. Reg. at 17,593.  Given that the agency actually considered this issue and had a chance to review it, the administrative exhaustion requirement has been satisfied.  See Natural Resources Defense Council, Inc. v. EPA, 824 F.2d 1146, 1151 (D.C. Cir. 1987) (court "excuse[s] exhaustion requirements for a particular issue when the agency has in fact considered the issue").

practicable" from independent sources reasonably at its

disposal.[49]

The Antidumping Agreement of GATT 1994 and the URAA evince a

preference that secondary information be corroborated.  While the

Antidumping Agreement permits the use of "facts available," the

Contracting Parties are required to check secondary information

from other "independent sources."  Annex II of the Agreement on

Implementation of Article VI of GATT 1994 at ¶ 7, reprinted in

U.S. Trade Representative, Uruguay Round of Multilateral Trade

Negotiations 168-169 (1994).  The SAA of the URAA further

clarifies that "secondary information may not be entirely

reliable" and that "corroborate means that the agencies will

satisfy themselves that the secondary information to be used has

probative value."  SAA at 870.  Commerce has said it determines

the probative nature of a margin based on whether it is reliable

and relevant.  Preliminary Results, 62 Fed. Reg. at 17,593.

---

[49]     Section 1677e(c) provides:

**(c)  Corroboration of secondary information**

     When the administering authority or the Commission
relies on secondary information rather than on information
obtained in the course of an investigation or review, the
administering authority or the Commission, as the case may
be, shall, to the extent practicable, corroborate that
information from independent sources that are reasonably at
their disposal.

Commerce applied a dumping margin of 29.89 percent to Saha Thai.  Commerce determined that this was the highest calculated margin from any prior administrative review. Id.  This was the rate applied to Thai Union Steel Co., Ltd. in Circular Welded Carbon Steel Pipes and Tubes from Thailand, 59 Fed. Reg. 65,753 (Dep't Commerce 1994) (amended final results) for a 1987-88 period.  Commerce found that corroborating this secondary information required "simply that [Commerce] satisfy itself that the secondary information to be used has probative value." Preliminary Results, 62 Fed. Reg. at 17,593 (citing SAA at 870). Commerce stated in the Preliminary Results that it would, "to the extent practicable, examine the reliability and relevance of the information used." Id.  Because the only source for calculating dumping margins are administrative determinations, Commerce concluded that if it "chooses as total adverse facts available a calculated dumping margin from a prior segment of the proceeding, it is not necessary to question the reliability of the margin for that time period." Id.  Commerce stated that the 29.89 percent rate was the highest rate for any prior segment of the proceedings, and that the court had affirmed this rate as applied to Thai Union in a recalculation pursuant to a remand order. See Primary Steel, Inc. v. United States, 18 CIT 20, 814 F. Supp. 1317 (1994); Circular Welded Carbon Steel Pipes and Tubes from Thailand, 59 Fed. Reg. 65,753 (amended final results of

antidumping duty admin. rev.).  Commerce concluded that this rate
was thus neither irrelevant nor inappropriate as "total facts
available rate for Saha Thai."  Preliminary Results, 62 Fed. Reg.
at 17,594.  Commerce did not revisit the relevance or
appropriateness of this rate in the Final Results.

Plaintiffs challenge the application of this margin on the
basis that it is neither reliable nor relevant, given that the
29.89 percent rate was applied to a different respondent at a
different time period.[50]  Moreover, the SAA recognizes that
secondary information must be corroborated because it "may not be
entirely reliable because ... it concerns a different time frame
than the one at issue."  SAA at 870.  Previously, the highest

---

[50]    Plaintiffs note that Saha Thai was reviewed during this
same 1987-88 administrative review and received a rate of 0.49
percent.  Much of the information used to calculate Thai Union's
rate was based on best information available.  In that review,
Commerce found that Thai Union's cost of production understated
the quantity of zinc actually on the pipes and did not include
the cost of couplings.  Commerce used the petitioner's
calculation to determine Thai Union's cost of production, which
was based on information submitted by Thai Union at various
times.  Commerce also used an IMF country-wide lending rate as
best information available, in order to calculate Thai Union's
credit costs on its US sales.  See Certain Circular Welded Carbon
Steel Pipes and Tubes from Thailand, 56 Fed. Reg. 58,355, 58,357-
358.  The court found Commerce's calculation of Thai Union's cost
of production "rationally related to Thai's Union's zinc usage
and coupling cost."  Primary Steel, Inc. v. United States, 17 CIT
1080, 1087-88, 834 F. Supp. 1374, 1381 (1993).  Likewise, the
court approved Commerce's use of the IMF rate as best information
available.  Id., 17 CIT at 1088-89, 834 F. Supp. at 1382.
By contrast, the rate calculated for Saha Thai during the
same review was not based on best information available, but on
Saha Thai's responses to Commerce's questionnaires.

rate calculated for Saha Thai in a less than fair value investigation was 17.28 percent.  <u>Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand</u>, 61 Fed. Reg. 1,328 (Dep't Commerce 1996) (final results of antidumping duty admin. rev.), <u>amended by</u> <u>Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand</u>, 61 Fed. Reg. 18,375, 18,376 (Dep't Commerce 1996) (1992-93 review period).

Wheatland asserts that Commerce's only choices for the facts available information was the petition data or the margin information from a previous review, and that the calculated margin was the only margin information available.[51]  Wheatland also minimizes the fact that Saha Thai's margin in the 1987-88 review was substantially lower than Thai Union's on the grounds that the question before Commerce in this review was whether the margin was appropriate for a collapsed Saha Thai/ Thai Hong/Thai Tube, and not simply Saha Thai.[52]

Since the passage of the URAA, Commerce is proceeding on the basis that prior calculated margins are <u>ipso</u> <u>facto</u> reliable.  <u>See</u> <u>Extruded Rubber Thread from Malaysia</u>, 63 Fed. Reg. 12,752, 12,763

---

[51]     In <u>Borden</u>, this court found petition margins were not corroborated, and in fact were discredited.  Commerce was not permitted to resort to the petition information under a "claim of necessity" where there were other suitable margins available. <u>Borden</u>, 4 F. Supp. 2d at 1247-48.

[52]     If collapsing is not appropriate, this reasoning would not be useful on remand.

(Dep't Commerce 1998) (final results of antidumping duty admin. rev.) ("absent evidence to the contrary, [prior calculated rate] is reliable and has probative value"); Canned Pineapple Fruit from Thailand, 63 Fed. Reg. 43,661, 43,665, (Dep't Commerce 1998) (notice of final results and partial rescission of antidumping duty admin. rev.) ("margins from other segments of the proceeding are by definition reliable sources").  Commerce says "relevancy" means that the prior margin should reflect the sales practices of the industry under examination.  Commerce has rejected prior margins which are not reflective of an industry's sales practices, even prior to the URAA.  See Fresh Cut Flowers from Mexico, 61 Fed. Reg. 6,812, 6,814 (Dep't Commerce 1996) (final results of antidumping duty admin. rev.) (Pre-URAA, applying BIA, rejection of a rate because it was "unrepresentative of the other companies in that review, and by extension, of the entire flower industry"); cf. Extruded Rubber Thread from Malaysia, 63 Fed. Reg. at 12,763 (post-URAA, applying same rationale, but concluding that a calculated rate did reflect business practices of rubber thread industry).  Commerce is essentially assuming that the margins are relevant unless there are extraordinary conditions demonstrating that the margins are irrelevant.  The exception is too restrictive.

Commerce must do more than assume any prior calculated margin for the industry is reliable and relevant.  Even under the

BIA standard, the court instructed Commerce that it cannot select margins which are out of context. See Manifattura Emmepi S.p.A. v. United States, 16 CIT 619, 624, 799 F. Supp. 110, 115 (1992) ("[Commerce's] authority to select best information otherwise available is subject to a rational relationship between data chosen and the matter to which they are to apply."). Nor can Commerce apply a margin which has been discredited. See D&L Supply Co. v. United States, 113 F.3d 1220, 1221 (Fed. Cir. 1997) (it is "improper for Commerce to continue to use, as the BIA rate, an antidumping duty rate that has been vacated as erroneous"). In D&L Supply Co., the court clarified that the purposes for applying the highest prior margin under the BIA scheme was to prevent the exporter from benefitting from refusing to provide information, and to select a margin which "bears some relationship to past practices in the industry in question." D&L Supply Co., 113 F.3d at 1223. Commerce can not select a rate which focuses only on inducing the exporter to cooperate, and ignores the interest in selecting a margin which relates to the past practices of the industry. Id. at 1224.

In the case of Saha Thai, Commerce selected a margin that was calculated eight years prior to the relevant POR, and which was calculated for another producer of subject merchandise. Moreover, much of the information on which Thai Union's margin was calculated was based on BIA. See Certain Circular Welded

Carbon Steel Pipes and Tubes from Thailand, 56 Fed. Reg. 58,355, 58,357-58; see also supra fn. 50.  Commerce had available several other margins previously calculated for Saha Thai, all of which were sources "reasonably at its disposal."[53]  See 19 U.S.C. § 1677e(c).  In its Final Results, Commerce did not elaborate on why the 1987-88 Thai Union margin was more probative than other Saha Thai margins, other than the fact that the Thai Union margin was higher.  Commerce also has not shown why, under its own definition of relevancy, the Thai Union rate reflects the sales practices of the pipe and tube industry.  Even when it is applying total adverse facts, under the URAA Commerce cannot assume the highest previous margin applies simply because it is the one most prejudicial to the respondent.

In order to comply with the statute and the SAA's statement that corroborated information is probative information, Commerce must assure itself that the margin it applies is relevant, and not outdated, or lacking a rational relationship to Saha Thai. The court accordingly remands this issue.  If Commerce applies total adverse facts to Saha Thai, Commerce must then corroborate the dumping margin it applies to Saha Thai as secondary information, assuring itself of its reliability and relevancy.

---

[53]    Prior margins assessed against Saha Thai in other administrative reviews range from 0.49 percent to 17.28 percent.

**CONCLUSION**

The court finds that Commerce reasonably continued the administrative review of Saha Thai, because Commerce had the discretion to deny Saha Thai's request for termination.  The court also affirms Commerce's interpretation of "affiliated parties" under 19 U.S.C. § 1677(33).  Commerce's interpretation of the new affiliation statute was permissible, in accordance with the law, and is entitled to deference, although Commerce must revisit its factual determinations as to who comprised the families at issue.  Further, Commerce did not provide Saha Thai with sufficient guidance for Saha Thai to know it had to provide information on companies owned by the nephews of one of its directors.  Therefore, on remand, Commerce must exclude the non-identification of Thai Tube and Thai Hong from its facts available analysis.

The court also remands the Final Results on the ground that Commerce did not properly apply 19 U.S.C. § 1677e in deciding whether it could apply total adverse facts.  Commerce must follow the requirements of § 1677e and conduct a separate analysis under sub-sections (a) and (b).  If it chooses to apply adverse facts available, Commerce will also have to corroborate the dumping margin by showing the relevance of a particular margin and why it may be reliably applied to Saha Thai.

Remand results are due within 60 days.  Objections are due 20 days thereafter, responses 11 days thereafter.

_____
                            Jane A. Restani
                            Judge

Dated:    New York, New York

          This    day of March, 1999.