**Slip Op. 00-90**

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____
| |
KOMPASS FOOD TRADING INTERNATIONAL,    :
HEARTLAND FOODS INC., NORTH            :
EAST MARKETING CO., PORT ROYAL SALES, LTD. :
and UNIPRO FOODSERVICE INCORPORATED,    :
                                     :

        Plaintiffs,                  :

J.A. KIRSCH CORP., MANDI FOODS, INC. and  :
SUMMIT IMPORT CORP.,                :

        Plaintiff-Intervenors      :

          v.                  :

THE UNITED STATES,             :  Court No.
                                  :  98-09-02848
        Defendant,                 :

        and                   :

MAUI PINEAPPLE CO., LTD. and THE      :
INTERNATIONAL LONGSHOREMEN'S AND     :
WAREHOUSEMEN'S UNION,             :

        Defendant-Intervenors.      :
_____:

[ITA's determination affirmed.]

                                 Dated: July 31, 2000

    Harris Ellsworth & Levin (Herbert E. Harris II and Jeffrey S. Levin) for plaintiffs Kompass Food Trading International, Heartland Foods Inc., North East Marketing Co., Port Royal Sales, Ltd. and Unipro Foodservice Incorporated.

    Harris Ellsworth & Levin (Herbert E. Harris II and Jeffrey S. Levin) for plaintiff-intervenors J.A. Kirsch Corp., Mandi Foods, Inc. and Summit Import Corp.

    David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Attorney, Commercial Litigation Branch,

Civil Division, United States Department of Justice (Michele
D. Lynch), Cindy G. Buys, Attorney, Office of Chief Counsel
for Import Administration, for defendant.

    Collier, Shannon, Rill & Scott, PLLC (Paul C. Rosenthal,
David C. Smith, Jr. and Adam H. Gordon) for defendant-
intervenors Maui Pineapple Co., Ltd. and the International
Longshoremen's and Warehousemen's Union.

## Opinion

**RESTANI, Judge:**  This matter is before the court on a

Motion for Judgment Upon the Agency Record, pursuant to USCIT

Rule 56.2, brought by plaintiffs Kompass Food Trading

International, Heartland Foods Inc., North East Marketing Co.,

Port Royal Sales, Ltd. and UniPro Foodservice Incorporated

(collectively referred to herein as the "Kompass Group") and

plaintiff-intervenors J.A. Kirsch Corp., Mandi Foods, Inc. and

Summit Import Corp. (collectively referred to herein as the

"Kirsch Group").

    Under review are the results of the U.S. Department of

Commerce's ("Commerce") administrative review of the

antidumping duty order on Canned Pineapple Fruit from

Thailand, 63 Fed. Reg. 43,661 (Dep't Commerce 1998) (notice of

final results and partial rescission of antidumping duty

admin. rev.) [hereinafter "Final Results"].  The Final Results

covered the period from July 1, 1996 through June 30, 1997.

Id.

Both the Kompass and Kirsch Groups contest Commerce's use of adverse facts available to Vita Food Factory Ltd. ("Vita"), the Thai producer and exporter.  They further contend that Commerce did not corroborate properly the margin it assigned to Vita.  Commerce responds that it selected a margin based on the adverse facts available in accordance with law.

## Jurisdiction and Standard of Review

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).  In reviewing Commerce's determination in administrative reviews, the court will hold unlawful those agency determinations which are unsupported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B) (1994).

## I.  Application of Total Adverse Facts Available to Vita

### Background

Both the Kompass and Kirsch Groups import canned pineapple fruit ("CPF") from Vita, a producer and exporter of CPF from Thailand.  Final Results, 63 Fed. Reg. at 43,663. Because Vita did not participate in the underlying less than fair value ("LTFV") investigation of CPF from Thailand, Commerce originally assigned it the "all others" rate of 24.64 percent.  See Canned Pineapple Fruit from Thailand, 60 Fed. Reg. 36,775, 36,776 (Dep't Commerce 1995) (notice of

antidumping duty order and amended final det.)
[hereinafter"Final Determination"].  In this review, Maui
Pineapple Co. Ltd. and the International Longshoremen's and
Warehousemen's Union specifically requested an administrative
review of Vita.  Letter from Maui Pineapple Co. to Commerce
(July 31, 1997), at 2, P.R. Doc 6, Pl.'s App., Ex. 6, at 2.

On August 29, 1997, Commerce sent Vita an antidumping
questionnaire and asked that it respond to parts A, B and C.
Letter from Commerce to Vita (Aug. 29, 1997), at 1, P.R. Doc
10, Pl.'s App., Ex. 10, at 1.  On January 2, 1998, Commerce
requested a supplemental questionnaire response to section A.
Letter from Commerce to Vita (Jan. 2, 1998), at 1, P.R. Doc.
87, Pl.'s App., Ex. 12, at 1.  Soon thereafter, Vita's counsel
informed Commerce that it was withdrawing its representation
of Vita.  Letter from Willkie, Farr & Gallagher to Commerce
(Jan. 8, 1998), at 1, P.R. Doc. 90, Pl.'s App., Ex. 13, at 1.
Only after Commerce inquired as to whether Vita would continue
to participate in the review did Vita respond to Commerce.
Letter from Vita to Commerce (Jan. 12, 1998), at 1, P.R. Doc.
239, Def.'s App., Ex. 4, at 1.  Vita explained, without
specificity, that the difficult economic situation in Thailand
had adversely affected its ability to participate in the
review process.  Id.  Nevertheless, Vita indicated that it

would attempt to answer Commerce's requests without the assistance of counsel.  Id.; Final Results, 63 Fed. Reg. at 43,664.

Commerce sent Vita another request asking it to respond to section D of the antidumping questionnaire because Commerce had reasonable grounds to believe Vita made sales of the subject merchandise below the cost of production ("COP") in Germany.  Letter from Commerce to Vita (Jan. 13, 1998), at 1, P.R. Doc. 95, Pl.'s App., Ex. 15, at 1.  Commerce next sent a letter requesting supplemental information for sections B and C.  Letter from Commerce to Vita (Jan. 27, 1998), at 1, P.R. Doc. 107, Pl.'s App., Ex. 16, at 1.  On the same day, Commerce sent Vita a letter detailing the requirements for documents to be submitted in this review because Vita no longer had counsel.  Letter from Commerce to Vita (Jan. 27, 1998), at 1, P.R. Doc. 114, Pl.'s App., Ex. 17, at 1.  Commerce also re-sent its supplemental questionnaire for Section A and extended the deadline for Vita to respond to it.  Id.  Finally, Commerce sent a letter to Vita reminding it of the approaching deadlines for all of the questionnaire responses.  Letter from Commerce to Vita (Feb. 5, 1998), at 1, P.R. Doc. 125, Pl.'s App., Ex. 18, at 1.  Vita never responded to any of these

letters from Commerce.[1]  Final Results, 63 Fed. Reg. at

43,665.

In the Final Results, Commerce used the adverse facts

available rate of 51.16 percent because Vita did not respond

to Commerce's repeated requests for information.  Id. at

43,665, 43,673.  Both the Kompass and Kirsch Groups object to

Commerce's use of adverse facts available as to Vita.

### Discussion

The Kompass and Kirsch Groups claim that Commerce should

have made a separate determination as to whether Vita

cooperated to the best of its ability in accordance with

Borden Inc. v. United States.  4 F. Supp.2d 1221, 1246 (Ct.

Int'l Trade 1998), aff'd sub nom. F. LLI de Cecco di Filippo

Fara S. Martino S.p.A. v. United States, 2000 U.S. App. LEXIS

14148 (Fed. Cir. 2000).  Commerce argues that it made an

adverse inference based on specific factual findings.

---

[1]  Vita's cooperation ended and it never responded after Commerce wrote Vita that it had received a verified allegation of third party sales at less than fair value.  See Commerce's Memorandum to File (Jan. 8, 1998), at 1-3, P.R. Doc. 92, Pl.'s App., Ex. 14, at 1-3 (using Vita's Section B and C responses to calculate COP for each product sold in Germany and finding it likely that Vita sold similar product at prices below COP).  Before Commerce informed Vita of the COP investigation, Vita had responded to Commerce's queries.  It even invited Commerce to come to Thailand and inspect the documents in its Bangkok office.  Letter from Vita to Commerce, at 2, Def.'s App., Ex. 4, at 2.  After Commerce informed Vita of the COP investigation, however, Vita ceased communicating.

Commerce repeatedly contacted Vita to send supplemental
responses, attempted to accommodate Vita's pro se status and
provided additional instructions to Vita, all without a single
response from Vita.  Commerce contends that this evidence
supports its determination that Vita did not act to the best
of its ability and that adverse inferences were warranted. The
court agrees.

The statutory scheme requires that Commerce first decide
whether the use of facts available is appropriate under 19
U.S.C. § 1677e(a) and then decide whether to apply adverse
inferences under 1677e(b).  See 19 U.S.C. § 1677e (1994).
Commerce correctly decided to use facts available based on the
requirements set forth in § 1677e(a)(2)(B).[2]  Next, Commerce
had to make a separate finding, supported by substantial
evidence, under 19 U.S.C. § 1677e(b) that Vita did not act to
the best of its ability to comply with Commerce's requests.
See 19 U.S.C. § 1677e(b).[3]  The court has held that a "mere

---

[2]  19 U.S.C. § 1677e(a)(2)(B) provides for use of facts
available if:
      (2)  an interested party or any other person . . .

            (B)  fails to provide such information by the
            deadlines for submission of the information or in
            the form and manner requested[.]

[3]  19 U.S.C. § 1677e(b) states in relevant part:
      If the administering authority or the Commission (as the
                                              (continued...)

recitation of the relevant standard is not enough for Commerce to satisfy its obligation under the statute." Ferro Union, Inc. v. United States, 44 F. Supp.2d 1310, 1330 (Ct. Int'l Trade 1999)(citation omitted). Moreover, Commerce "must be explicit in its reasoning" when applying adverse facts available. Id. at 1331.

In five separate letters, Commerce made efforts to accommodate Vita's alleged difficulties and attempted to elicit a response from Vita. Final Results, 63 Fed. Reg. at 43,664. Commerce extended a deadline, provided instructions for submitting responses and even sent Vita a reminder notice that the submissions were due. Id. at 43,664-665. Vita did not respond and did not provide any explanation as to why it was unable to do so. Id.

The Kompass and Kirsch Groups attempt a post hoc rationalization of Vita's conduct. They argue that the severe economic crisis in Thailand crippled Vita and prevented it from responding. The Thai economic crisis, however, likely

---

(...continued)
case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.

would have affected all respondents in the review.  Commerce
emphasizes that two other respondents were not represented by
counsel but managed to respond to the questionnaires.  See,
e.g., Siam Fruit Canning Co. Supplemental Questionnaire
Response (Feb. 12, 1998), at 1, P.R. Doc. 139 (submitted to
Commerce without counsel); Prachuab Fruit Canning Co.
Supplemental Questionnaire Response (Feb. 3, 1998), at 1, P.R.
Doc. 118 (submitted to Commerce without counsel).  Vita, too,
had informed Commerce it would continue to participate despite
the economic difficulties.  If the situation worsened, Vita
should have informed Commerce and provided a proper
explanation.  See, e.g., 19 U.S.C. § 1677m(c)(1) (1994)
(requiring respondent to notify Commerce if it is unable to
submit information requested).

     The Kompass and Kirsch Groups also argue that Vita was a
first-time participant and Commerce should have made it clear
that ceasing communication would result in the use of adverse
inferences.  Commerce, however, repeatedly warned Vita that a
failure to provide information would result in the use of
facts available.  See Letter from Commerce to Vita (Jan. 2,
1998), at 2, Pl.'s App., Ex. 12, at 2 (notifying Vita that
facts available would be used if Vita did not respond to
supplemental questionnaire for section A); Letter from

Commerce to Vita (Jan. 13, 1998), at 1, Pl.'s App., Ex. 15, at

1 (notifying Vita that failure to respond to Section D of

questionnaire would lead to use of facts available as set

forth in Section 776(b) of Act); Letter from Commerce to Vita

(Jan. 27, 1998), at 2, Pl.'s App., Ex. 17, at 2 (notifying

Vita that failure to respond to supplemental questionnaires

for sections B and C would result in use of facts available as

defined in glossary of original questionnaire).  Contrary to

the Kompass and Kirsch Groups' assertions, Commerce attempted

to assist Vita as well as warn Vita of the consequences.  With

no response from Vita forthcoming, further assistance from

Commerce was not warranted.

Accordingly, the court sustains Commerce's finding that

Vita did not act to the best of its ability.

## II.  Corroboration of Adverse Facts Available Rate

### Background

In the underlying LTFV investigation, Commerce assigned

Vita the "all-others" rate of 24.64 percent.  Final

Determination, 60 Fed. Reg. at 36,776.  In the Final Results

of this administrative review, Commerce assigned Vita a margin

of 51.16 percent.  Final Results, 63 Fed. Reg. at 43,673.

This margin represents the highest calculated margin from a

cooperative respondent, Siam Agro Industry Pineapple and

Others Company ("SAICO"), in the original LTFV investigation.
Id. at 43,665.

## Discussion

The Kompass and Kirsch Groups contest the use of the highest calculated margin in the underlying LTFV investigation.  They assert that the margin is not relevant because it does not reflect the difficulties of Vita's situation.  Commerce responds that the rate assigned to Vita is both corroborated and relevant.  It argues that it has used a margin properly calculated from a fully cooperative respondent from the underlying LTFV investigation. Additionally, Commerce contends SAICO's business practices are representative of the Thai pineapple industry.  The court agrees.

Pursuant to 19 U.S.C. § 1677e(c), Commerce must corroborate any secondary information it relies on from independent sources reasonably at its disposal.  19 U.S.C. § 1677e(c).[4]  According to the Statement of Administrative

---

[4]  19 U.S.C. § 1677e(c) states:
        When the administering authority or the Commission
relies on secondary information rather than on information
obtained in the course of an investigation or review, the
                                              (continued...)

Action ("SAA"), "[c]orroborate means that the agencies will satisfy themselves that the secondary information to be used has probative value."  SAA accompanying the Uruguay Round Agreements Act ("URAA"), H.R. Rep. No. 103-826(I) at 870 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 4199.

In Ferro Union, this court instructed Commerce that the margin selected has to be reliable and relevant.  44 F. Supp.2d at 1335.  Furthermore, Commerce must use a margin that bears a rational relationship to the respondent or the past practices of the industry.  Id. at 1334-35 (citations omitted).

The Kompass and Kirsch Groups challenge Commerce's use of SAICO's margin because it is not an attempt to find Vita's "true" dumping margin.  Once a respondent refuses to respond to a questionnaire or does not supply Commerce with an adequate explanation for refusing to respond, Commerce no longer focuses on calculating the "true" margin but instead must focus on determining an adverse margin that will induce

---

[4](...continued)
administering authority or the Commission, as the case may be, shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal.

cooperation in the future.

Under the pre-URAA law, the Federal Circuit Court of Appeals approved Commerce's use of the highest margin from prior proceedings as best information available ("BIA"). Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990) (affirming use of highest calculated margin from prior administrative reviews as BIA for respondent who provided deficient submissions); see also Mitsuboshi Belting Ltd. v. United States, No. 93-09-00640, 1997 WL 118397, at *3 (Ct. Int'l Trade Mar. 12, 1997). This court has recognized that an uncooperative respondent cannot control the results of the administrative process via its own unresponsiveness. Mitsuboshi, 1997 WL 118397, at *3. Moreover, the agency relies on the common sense inference that the highest margins are the most probative because the respondent did not provide information to rebut this inference. Id.

The Kompass and Kirsch Groups next attempt to cast doubt upon Commerce's choice of SAICO's margin by claiming that depreciation of the baht is an indicator that Vita was less likely to engage in LTFV pricing. The record does not reveal any evidence in support of this contention nor do the Kompass and Kirsch Groups indicate that any record evidence supports

their assertion.  On the contrary, record evidence indicates that Vita may have engaged in LTFV pricing in Germany. Commerce's Memorandum to File, at 1-4, Pl.'s App., Ex. 14, at 1-4.

Commerce also asserts that SAICO was a fully cooperative respondent, representative of the Thai pineapple industry. See Final Results, 63 Fed. Reg. at 43,665.  Commerce justifies its finding based on two facts.  First, no record evidence indicates that SAICO's practices differed from the rest of the Thai pineapple industry.  Id.  Second, the inclusion of SAICO's rate[5] in the calculation of the "all others" rate in the original LTFV investigation also supports the position that SAICO was representative of the industry.[6]  Id.

---

[5]  The Kompass and Kirsch Groups challenge Commerce's cost of production methodology for calculating SAICO's margin.  The Federal Circuit, however, affirmed Commerce's cost of production methodology.  See Thai Pineapple Public Co. v. United States, 187 F.3d 1362, 1369 (Fed. Cir. 1999).

[6]  Given that SAICO's margin is rational and relevant, the mere fact that it is three years old is an insufficient basis to invalidate the margin.  The cases that the Kompass and Kirsch Groups cite for support to invalidate SAICO's margin contain facts that differentiate them from this case.  In Manifattura Emmepi S.p.A. v. United States, the court invalidated the use of an eight year old calculated margin that bore no relationship to respondent because respondent was not in the market at the time and, after participating in the prior review, had received a zero calculated margin.  16 CIT 619, 623-24, 799 F. Supp. 110, 114-15 (1992).  In contrast, Vita had received the "all others" rate of 24.64 percent in
(continued...)

Finally, the Kompass and Kirsch Groups argue that Vita, like Madhya in Stainless Steel from India, should receive the "all-others" rate and not the highest calculated margin from the original LTFV investigation.  See Stainless Steel Bar from India, 64 Fed. Reg. 13,771, 13,774-776 (Dep't Commerce 1999) (giving Madhya the "all-others" rate because it responded to Commerce's questionnaires, but in an untimely fashion).  The crucial difference between Madhya and Vita is that Madhya responded to Commerce's questionnaires and never ceased communicating.  See id. at 13,774.  Vita, on the other hand, never responded to Commerce's five separate attempts to elicit a response from Vita.

Commerce gave Vita ample opportunity to demonstrate that the all-others rate was still the appropriate rate.  Vita either should have supplied Commerce with the information requested or it should have provided a proper explanation for its failure to participate further in the review.

---

    [6](...continued)
the original LTFV investigation and its marked lack of cooperation would have required a margin higher than the "all others" rate to induce cooperation in subsequent reviews.  In Ferro Union, Commerce tried to rely on a margin that was eight years old and most of the information used to calculate that margin was based on best information available.  44 F. Supp.2d at 1335.  In this case, Commerce used a properly calculated margin and the record did not reveal any evidence undercutting its validity for this review.

## Conclusion

For the foregoing reasons, the court affirms Commerce's use of adverse facts available and the margin Commerce assigned to Vita.

_____

Jane A. Restani

Date:  New York, New York

This 31st day of July, 2000.